J-A23043-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO L.J.B., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M.S., MOTHER | : : : : : | |
| | : | No. 778 MDA 2022 |

Appeal from the Decree Entered April 21, 2022
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
2021-4556 A

BEFORE:   BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED NOVEMBER 16, 2022**

J.M.S. ("Mother") appeals from the decree granting Centre County Children and Youth Agency ("CYS" or "Agency") petitions to involuntarily terminate her parental rights to her two-year-old daughter, L.J.B., under 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b) and change the goal from reunification to adoption.  Mother's counsel ("Counsel") has filed a petition to withdraw and an accompanying brief pursuant to *Anders. V. California*, 386 U.S. 738 (1967) and *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009). We affirm and grant counsel's petition to withdraw.

The orphans' court's Pa.R.A.P. 1925(a) opinion sets forth the pertinent facts and procedural history, as follows:

[On October 15, 2021, the Agency filed a petition seeking to terminate the parental rights of Mother and Father.]  At the April

---

* Former Justice specially assigned to the Superior Court.

8, 2022 termination hearing, the Agency presented testimony from two Agency caseworkers who worked with Mother, Father, and L.J.B, and from a Youth Service Bureau [("Y.S.B.")] reunification worker who worked with the family in connection with providing formal reunification services. Various documents from the dependency docket were also filed collectively as an Agency exhibit. Mother and Father both testified in support of their respective positions.

With respect to Mother, the evidence demonstrated the existence of ongoing, significant safety concerns regarding her ability to parent L.J.B. based on mental health diagnoses (depression, anxiety, and bipolar disorder) for which Mother was not consistently treating, substance abuse, and housing instability. [N.T., 4/8/22, at 20, 54-57]. The Agency had been involved with Mother and her older daughter, "M", since the fall of 2018 based on similar concerns and as a result of referrals that then three-year-old M was left outside alone and unsupervised on more than one occasion. [N.T. at 7, 13].

Mother's parents ultimately secured custody of M and Mother had supervised visits. [N. at 7]. The Agency continued to provide services to Mother in connection with her parenting of M, including parenting education and support and encouragement of Mother's mental health treatment. Mother was cooperative at times and at other times uncooperative, irrational, and erratic. There was significant conflict with her family. [N.T at 14.]

In May of 2019, Mother became involved with Father. In November of 2019, the Agency received a report that Mother was pregnant with L.J.B. and was abusing Adderall. The Agency, working together with Mother's mental health blended case manager, attempted to address the Adderall use issue with Mother. Mother's mental health and related instability remained a primary concern. Testimony established that, by 2020, Mother was also having difficulty focusing at her job, and housing stability became an ongoing issue due to failure to pay rent, family conflicts, and significant property damage in a rented home that lead [sic] to problems with Mother's landlord. A CYS caseworker met with mother ten days before she gave birth to L.J.B. and [found] Mother was difficult to communicate with and unfocused. Mother tested positive for amphetamines and marijuana at the hospital after giving birth to L.J.B. on March 14, 2020. [N.T. at 15-20].

L.J.B. was adjudicated dependent on April 1, 2020, and placed in the care and custody of CYS.[ ] L.J.B. was placed with a foster family, and she has remained in the foster home since her initial placement. [N.T. at 21-24]. As of the time of the termination of parental rights hearing on April 8, 2022, L.J.B. has been in foster care for a little more than two years, [which constitutes] the entirety of her life. L.J.B. was adjudicated dependent due to significant safety concerns for this vulnerable child should she be in the care and custody of either parent under the circumstances as they existed at that time. [N.T. at 24].

As to Mother, the evidence showed that she experienced a great deal of instability in numerous facets of her life due to ongoing mental health problems, for which she was not adequately treating, as well as drug abuse. Domestic violence between Mother and Father was also a concern. Although Mother had services available and had been connected with providers for some time, she did not consistently follow through with services. N.T. at 54-64].

As to Father, although he expressed an interest in taking custody of L.J.B. on her birth, the Agency had previously been open for services in connection with other children of Father and could not assure the safety of newborn L.J.B. in his care and custody due to ongoing concerns regarding drug use and housing and employment instability. There were also concerns regarding Father's domestic violence.

CYS initially provided reunification services and support to Mother and Father while they were [waitlisted] for formal purchased reunification services to begin. Mother and Father were not living together, and services were offered separately. Because of pandemic conditions in early 2020, visits with L.J.B. were initially held by Zoom. The Agency worked with Mother and Father to facilitate effective and fulfilling visits and to help them with the technology skills required to participate. In this initial period, Mother did well during visits, and engaged with L.J.B. in a loving, affectionate way. Visits were eventually moved to Mother's home for a time. Father participated in Zoom visits during this period, but not consistently. [N.T. at 24-49].

Formal reunification services through YSB began in December of 2020 and continued for approximately nine months, until August

of 2021. From the outset of formal reunification services, Mother appeared to have decompensated from a mental health perspective and seemed very unstable. She was unfocused and either unable or unwilling to cooperate when it came to fairly basic tasks such as reviewing documents and required releases. She also consistently tested positive for various drugs, which included cocaine, fentanyl, methamphetamine, amphetamines, opiates and THC. [N.T. at 54-64].

The reunification worker continued addressing drug abuse concerns with Mother and attempted to help her, to no avail. Mother at times appeared impaired or subdued to the point that she did not actively participate in visits with L.J.B. Mother had been recommended for a partial hospitalization in the summer of 2020 but chose not to follow through; according to Mother, she was afraid of losing her job. [N.T. at 64-71].

She was ultimately discharged from mental health and substance abuse counseling for noncompliance and/or failure to attend. Mother's reunification counselor testified to concerns over Mother's ability to handle basic parenting tasks. These issues could not be addressed because of the need to focus primarily on Mother's mental health and substance abuse problems, and there was never an ability to progress beyond that focus due to mother's unwillingness or inability to cooperate or follow through with treatment. [N.T. at 70-72].

[The Agency determined that] Mother's mental health issues and substance abuse clearly negatively impacted her ability to parent and to provide safety for L.J.B. Mother was inappropriate in handling of L.J.B. and in interactions with her YSB caseworkers. Home conditions were at times found to be inappropriate for a young child, with items such as razors found on the floor. She was observed to be hallucinating during a visit with L.J.B. Mother could not consistently use a car seat or highchair properly, and at times demonstrated exasperation at being asked to try. [N.T. at 62-71]

Mother was continuing to feed L.J.B. baby food after L.J.B. had transitioned to regular food, and on one occasion overfed L.J.B. to the point she was gagging. Mother was harsh in her words and tone with L.J.B. Reunification workers had to intervene during many visits to ensure L.J.B.'s safety and well-being. [N.T. at 63, 67-68].

At about one year of age, L.J.B. appeared fearful of Mother; she would be tearful and at times scream when Agency workers spoke of visits with Mother. Visits were moved from the home to an Agency setting because of safety concerns. Visits were ultimately terminated on July 20, 2021, after a hearing because of Mother's conduct and to protect L.J.B.'s well-being. [N.T. at 70-71].

Mother was fired from her job in late July of 2022[, although she subsequently attained other employment], and [she] was experiencing difficulties in the relationship with her landlord. Formal reunification ended in August of 2021 given the lack of cooperation. The Agency served Mother with paperwork for the termination hearing in December of 2021. She appeared disheveled and "off" to the caseworker. [N.T. at 72-100].

In January of 2022, Mother was admitted for a brief in-patient psychiatric stay. She was released with prescribed medications. She contacted a mental health provider, and, as of the termination hearing date, was on a waiting list for intake. She did not provide a release for related records.

Mother testified at the termination hearing. As of that time, she was working with services in the community to attain stable housing, but was living in a hotel and planning to transition to another. She was working with other community supports to secure connections to services. She testified to wanting to develop a closer relationship to the foster family so she can be close to L.J.B.

Mother dropped a PFA she had obtained against Father, and she planned to count on him for support. According to Mother, she and L.J.B. had formed an attachment with the Agency workers before formal reunification services with YSB began, and she could see a difference in L.J.B. after YSB became involved. She found it difficult to accept criticism from the YSB caseworkers because she did not respect them. She was proud of L.J.B.'s ability to form a bond. She initially considered voluntary termination because L.J.B. was doing so well but ultimately decided to fight it after talking with Father.

. . .

- 5 -

The evidence established that L.J.B. is well-adjusted and happy in her foster home. She has developed a healthy bond with her foster parents and siblings. She has started talking and calls her foster parents "mama" and "dada." The foster parents are actively involved in maintaining a relationship between L.J.B. and her maternal grandparents and her step-sister, M. L.J.B.'s foster parents are an adoptive resource for her.

Orphans' Court Opinion, 4/21/22, at 1-5.

Following the termination of parental rights hearing, the orphans' court granted the Agency's petition involuntarily terminating Mother's and Father's parental rights and changing the goal for L.J.B. to adoption. In so doing, the Court determined that evidence sufficed to establish each of the three grounds for termination under 23 Pa.C.S. § 2511(a)—specifically, subsections (a)(1), (a)(5), and (a)(8)—raised by the Agency. Mother's timely counseled appeal followed.[1]

In this Court, Counsel has filed both a petition to withdraw and an **Anders** brief. When presented with an **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw. **See Commonwealth v. Garang**, 9 A.3d 237, 240 (Pa. Super. 2010).

Pursuant to **Anders**, when counsel believes an appeal is frivolous and wishes to withdraw from representation, counsel must do the following:

(1) petition the court for leave to withdraw stating that after making a conscientious examination of the record, counsel has determined the appeal would be frivolous; (2) file a brief referring to any issues that might arguably support the appeal, but which

_____

[1] Father did not appeal the termination of his parental rights.

does not resemble a no-merit letter; and (3) furnish a copy of the brief to the defendant and advise him of his right to retain new counsel, proceed *pro se*, or raise any additional points he deems worthy of this Court's attention.

***Commonwealth v. Edwards***, 906 A.2d 1225, 1227 (Pa. Super. 2006) (internal citation omitted).  In ***Santiago***, our Supreme Court addressed the second requirement of ***Anders***, *i.e.*, the contents of an ***Anders*** brief, and required that the brief:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361.

This Court has extended the ***Anders*** principles to appeals involving the termination of parental rights. ***See In re V.E.***, 611 A.2d 1267, 1274-75 (Pa. Super. 1992).  "Once counsel has satisfied the [***Anders***] requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." ***Edwards***, 906 A.2d at 1228 (internal citation omitted).

Here, Counsel has filed a petition to withdraw citing ***Anders*** and ***Santiago***, and she includes a statement that she conducted a thorough review

and determined there were no meritorious issues that could support Mother's appeal. Counsel concludes that Mother's appeal is frivolous.

Counsel's *Anders* brief also includes a summary of the facts and procedural history of the case, and it acknowledges Mother's chief complaint that, in her opinion, she did not receive sufficient support or services by a multidisciplinary team working to maintain the parent-child relationship. Counsel discusses why this issue lacks merit:

> The child has been in the care and custody of CYS the entire two years of her life. N.T at 93. Both CYS and the reunification team attempted to provide support and services to [Mother] in hopes of assisting [Mother] in remedying the significant mental health and drug abuse issues, as well as concerns about housing stability and inadequate parenting skills. N.T. at 54-55, 66-68. Over the course of the two years between the child's birth and the termination of parental rights, [Mother] demonstrated an unwillingness or inability to consistently attend mental health and substance abuse counseling, N.T. at 57, to refrain from abusing illegal substances, N.T. at 54-55, to attend and cooperate with the services provided by CYS and the reunification team, N.T. at 14, 16, and to act in a safe and appropriate manner during the supervised visits provided by the agencies. N.T. at 65-69, 71-72.
>
> [Mother] was able to begin addressing her mental health concerns by completing an in-patient stay at a mental health institution and engaging in follow-up treatment thereafter. N.T. at 101. She also testified about taking the initiative to work with various local agencies to secure stable housing, obtain employment and coordinate mental health and substance abuse services. *Id*. However, these developments occurred after being served with notice of the Petition for Involuntary Termination, and the trial court therefore was precluded from considering these positive developments pursuant to 23 Pa.C.S. 2511(b). The trial court properly analyzed only the circumstances from the time of the child's placement until December 2021.

*Anders* Brief, at 11-13.

Counsel also indicates that she mailed Mother copies of her petition and *Anders* brief, as well as correspondence explaining her rights to retain private counsel or proceed *pro se* and raise any additional arguments she believes are meritorious.

We conclude that Counsel has complied with the requirements of the *Anders* procedure described above. Accordingly, we will conduct an independent review to determine whether Mother's appeal is wholly frivolous.

As noted above, Counsel identifies the following issue for review:

> Mother did not receive sufficient support or services by a multidisciplinary team working to maintain the parent-child relationship.

*Anders* Brief at 10.

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: when reviewing a decree terminating parental rights, this Court must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re J.W.B.*, 232 A.3d 689, 695 (Pa. 2020) (internal citation omitted).

Further, the trial court is free to believe all, part, or none of the evidence presented and is likewise free to resolve conflicts in the evidence. *See In re D.A.T.*, 91 A.3d at 203. "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re M.M.*, 106 A.3d 114, 117 (Pa. Super. 2014) (citation omitted).

"If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id***. (internal citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511. The burden is upon CYS to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. ***See In re D.A.T.***, 91 A.3d 197, 203 (Pa. Super. 2014). "Clear and convincing evidence is that which is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Interest of A.M.***, 256 A.3d 1263, 1270 (Pa. Super. 2021) (citation and quotation marks omitted).

Termination of parental rights under Section 2511 requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

***In re C.M.K.***, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section

2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Moreover, we may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201(Pa. Super. 2000) (*en banc*).

As we need only agree with the orphans' court as to one subsection of Section 2511(a), we analyze whether the Agency properly established grounds for termination under Section 2511(a)(8). That section provides in relevant part:

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

To satisfy subsection 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018).

Unlike other subsections, subsection 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). In fact, the Adoption Act prohibits the court from considering, as part of a subsection 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). While "the application of [subsection 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of [his or] her children.," this Court has recognized that

by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to

complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). *See also In the Interest of T.M.W*., 232 A.3d 937, 949 (Pa. Super. 2020) ("[W]here a child is in foster care, a parent has the affirmative duty to work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for her to be capable of performing her parental duties and responsibilities.").

In the instant case, the orphans' court determined that more than one year had elapsed since the Agency removed L.J.B. from Mother's care, that Mother had made no progress toward remedying the problems that led to placement of the child with the Agency, and that termination served the child's needs and welfare, which could no longer be placed on hold while Mother belatedly attempted to attain stability.

To these points, the court observed:

the child "has been in [Agency] care for two years—all her life— and during almost the entirety of that time, the conditions that [led] to [child's] placement continued to exist despite ongoing diligent efforts by the Agency and by reunification workers to provide support and connect Mother and Father with a host of services to help remedy those conditions. The issue was not a lack of adequate, readily available services; the issue was a failure on the part of parents to follow through and cooperate. The evidence established, as to both Mother and Father, that they either could not, or would not, engage in services to remedy the conditions leading to placement and alleviate the safety concerns they presented in terms of parenting L.J.B, a young vulnerable child. During that time, L continued to grow and develop and to need love and support of a family.

- 13 -

Trial Court Opinion, at 8. As the record supports this observation, we agree with the orphans' court's analysis and conclusion that the Agency established grounds under Section 2511(a)(8) by clear and convincing evidence.

We turn now to subsection (b), which requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, 71 A.3d at 628 (citation and quotation marks omitted). Our Supreme Court has made clear that section 2511(b) requires the orphans' court to consider the nature and status of bond between a parent and child. **In re E.M.**, 620 A.2d 481, 484-485 (Pa. 1993). It is reasonable to infer that no bond exists when there is no evidence suggesting the existence of one. **See In re K.Z.S.**, 946 A.2d 753, 762–763 (Pa. Super. 2008). To the extent there is a bond, the orphans' court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." **In re E.M.**, 620 A.2d at 484-485.

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." **In re M.M.**, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as

the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *Interest of L.W.*, 267 A.3d at 524.

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail ... the result, all too often, is catastrophically maladjusted children." *Id*.

The orphans' court determined the Agency proved its burden under subsection 2511(b). Evidence established that L.J.B. had formed an emotional bond with her foster family, now referring to them as "mama" and "dada" as she begins to talk, whereas, in contrast, she had cried and appeared fearful of Mother during their visits. Though Mother had exhibited a healthy bond with the newborn child in the early months after Agency placement, the bond had since deteriorated as she stopped cooperating with services.

While the orphans' court did not doubt that Mother loved her child, it reasoned that her unwillingness to cooperate with Agency workers and her resultant noncompliance with goals over the majority of the relevant timeline impeded the formation of a healthy bond between herself and her child. Under the Section 2511(b) rubric, therefore, the trial court determined it would best meet L.B.J.'s emotional needs and serve her well being by keeping intact the healthy, mutual emotional bond existing between her and her foster parents. Accordingly, the orphans' court viewed terminating Mother's parental rights and changing the placement goal to adoption as serving the child's best interests. We discern no error with this conclusion.

Based on our review of the record, we agree with Counsel that Mother's challenge charging the Agency with offering insufficient services to enable her to meet her reunification goals is wholly without merit. Furthermore, considering our duty to ascertain whether there are any arguably meritorious issues counsel missed or misstated, we note that we observe none. Ample evidence supported the orphans' court's decision to terminate Mother's parental rights pursuant to Subsections 2511(a) and (b).

Accordingly, we affirm the decree terminating Mother's parental rights and changing the placement goal from reunification to adoption, and we grant counsel's petition to withdraw.

Decree affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/2022